**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
WESTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOSE WILLIAM ORELLANA,<br><br>Defendant. | No. CR14-4046-DEO<br><br>***REPORT AND RECOMMENDATION<br>ON MOTION TO SUPPRESS*** |

## *I. INTRODUCTION*

Defendant Jose William Orellana is charged by indictment (Doc. No. 3) with conspiracy to distribute a controlled substance (methamphetamine). He has filed a motion (Doc. No. 20) to suppress statements he made to law enforcement after being arrested on May 13, 2014. Plaintiff (the Government) has filed a resistance (Doc. No. 29). The Honorable Donald E. O'Brien, Senior United States District Judge, has referred the motion to me for the preparation of a report and recommended disposition.[1]

I held an evidentiary hearing on July 29, 2014. Assistant United States Attorney Shawn Wehde appeared on behalf of the Government. Orellana appeared personally and with his attorney, Stuart Dornan. The Government offered the testimony of Drug Enforcement Administration (DEA) Special Agent Chad Schmitt. Orellana presented no testimony. The following exhibits were admitted into evidence under seal without objection:

---

[1] Because trial is currently scheduled to begin September 2, 2014, the parties should take note of the condensed schedule for objections, and responses to objections, set forth at the conclusion of this report and recommendation.

*Government's Exhibit 1*: Audio and Video Recording of Interview

*Government's Exhibit 2*: Transcript of Interview

*Government's Exhibit 3*: Initial Agent Report

*Government's Exhibit 4*: Supplemental Agent Report

The motion is now fully submitted.

## II. FINDINGS OF FACT

Based on the evidence presented, I find as follows:

Orellana was arrested by agents of the Drug Enforcement Administration (DEA) on May 13, 2014, during a methamphetamine conspiracy investigation. He was transported to the Sioux City Police Department for an interview. An audio and video recording (the Recording) was made of the interview. Gov't Ex. 1. Because the interview was conducted in both English and Spanish, the Government later arranged to have a transcript (the Transcript) prepared that included an English translation of the Spanish discussions. Gov't Ex. 2. The Transcript was prepared by the Joint Language Training Center, which regularly performs translation and transcription services for the DEA. Orellana offered no evidence that the Transcript is incomplete or inaccurate. I find that the Transcript accurately depicts the interview and includes accurate English translations of statements made in Spanish.

The interview commenced at approximately 1:10 p.m. in an interview room. At that time, DEA Special Agent Chad Schmitt was present, along with Officer Angela Kolker of the Sioux City Police Department. Gov't Ex. 2 at 2. Orellana was seated in a chair with his hands cuffed behind his back. He stated that he speaks no English, so Kolker, who speaks Spanish, served as an interpreter. *Id.* at 2-3. Schmitt advised Orellana, through Kolker, that he wanted to know if Orellana would cooperate because,

2

according to Schmitt, the DEA knew that Orellana had been selling methamphetamine for months. *Id.* at 3. Schmitt further told Orellana that the only way he could help himself would be to tell the truth. *Id.*

Through Kolker, Schmitt determined that Orellana is able to read in Spanish. *Id.* at 4. Orellana indicated that he can read despite having completed less than elementary school in El Salvador. *Id.* at 4-5. Schmitt then stated that it would be necessary for Orellana to read his rights out loud, so Orellana was given the DEA-13A (Advice of Rights) Form, printed in Spanish, and asked to read it.[2] *Id.* at 5. He read the form aloud in Spanish but Kolker stated that he had "skipped a little bit in there."[3] *Id.* Kolker proceeded to read the entire form aloud in Spanish. *Id.* at 5-6.

The events that followed over the next few seconds are what prompted Orellana's motion. The initial report that Schmitt prepared and signed on May 15, 2014, states that after Kolker advised him of his rights, Orellana stated: "Yes, but I don't know what it means, but yes." Gov't Ex. 3 at 2. Orellana filed his motion to suppress on June 27, 2014, based on that report.

On July 9, 2014, Schmitt prepared and signed a supplemental report in which he stated that based on a review of the Recording, his earlier report was not accurate. Instead, according to the supplemental report, Orellana's actual statement was: "Yes, I don't know what I can answer, yes." Gov't Ex. 4 at 1. The supplemental report

---

[2] While the transcript does not reflect that the form at issue was the DEA-13A (Advice of Rights) Form, other evidence indicates that it was. *See, e.g.,* Gov't Ex. 3 at 2.

[3] After carefully reviewing the Transcript and comparing Orellana's recitation of the form to Kolker's subsequent recitation, I am unable to determine what portion of the form, if any, Orellana actually skipped. The two recitations are virtually identical. The portions Orellana read aloud include the following statements (as translated): (a) "Before asking any questions, you should understand, you have the right to remain silent," (b) "Anything you say can be held against you in a court," (c) "You have the right to consult an attorney before answering questions and have said lawyer present during the questioning," and (d) "If you can not pay for the services of a lawyer, one shall be assigned to you before questioning if you wish." *Id.*

further stated that that recorded interview would be "submitted to a contracted Language Center for translation/transcription." *Id*. Schmitt testified that his initial report was written approximately two days after the interview and was based on his memory and his notes. He testified that his quotation of Orellana's response in the initial report was simply wrong and that he prepared the supplemental report after reviewing the relevant portion of the Recording.

The Transcript indicates that after Kolker read the rights aloud in Spanish, she stated: "Do you understand? OK. Are you willing to answer some questions?" Gov't Ex. 2 at 6. The Transcript then quotes Kolker as telling Schmitt that Orellana's response was: "Yes, I don't know what I can answer. Yes." Gov't Ex. 2 at 6. And, in fact, the recording captures Kolker reciting this interpretation immediately after Orellana answered. *See* Gov't Ex. 1 at approximately 1:17:20 p.m. The Transcript, however, includes a slightly-different English interpretation of Orellana's response: "Well, yes. No . . . Well, I don't know, whatever I can answer, yes." Gov't Ex. 2 at 6.

The Recording reveals that after reading the *Miranda* rights aloud in Spanish, Kolker stated one word in Spanish, and then paused. According to the Transcript, that word was "Entiende," which the Transcript translates to English as "Do you understand?" *Id*. at 5-6. The Recording shows Orellana nodding at that point. *See* Gov't Ex. 1 at approximately 1:17:08 p.m. After this nod, Kolker stated "OK" and then asked another question in Spanish, which the Transcript translates to English as "Are you willing to answer some questions?" Gov't Ex. 2 at 6. It was at this point that Orellana gave an answer that, according to the Transcript, was "Well, yes. No . . . Well, I don't know, whatever I can answer, yes." *Id*.

After careful review of the Transcript and the Recording, I find that Schmitt's initial version of Orellana's response, as set forth in Government Exhibit 3, was

4

incorrect. I further find that Orellana – by nodding – gave a nonverbal affirmative response to Kolker's question of whether he understood the rights Kolker had just recited. When Kolker stated "OK," she was responding to Orellana's nod. In addition, I find that when Kolker then asked Orellana if he was willing to answer some questions, he stated: "Well, yes. No . . . Well, I don't know, whatever I can answer, yes." I find that this response was affirmative, meaning Orellana communicated that he was, in fact, willing to answer questions.[4]

Once Orellana gave this response, Schmitt conducted the interview with Kolker acting as the interpreter. Orellana answered Schmitt's questions without making any comments or asking any questions about his right to remain silent or his right to have an attorney present. His handcuffs were then removed approximately 19 minutes after the interview started. *See* Gov't Ex. 1 at approximately 1:29 p.m. Questioning continued and Orellana continued to provide answers. Throughout the interview, the atmosphere in the room appears to have been as relaxed as possible under the circumstances. Orellana was provided with water, laughed occasionally and gave no indication that he was acting under duress or compulsion.

After some period of time, Task Force Officer Benjamin Gill entered the room and asked additional questions, which Orellana also answered. Later, Officer Cindy Martinez of the Sioux City Police Department took over as the interpreter in the room. Throughout this process, Orellana made various incriminating statements, which he now seeks to suppress.

---

[4] Nothing about Orellana's body language during this short period of time is inconsistent with these findings. Orellana smiled and shrugged slightly while providing his verbal answer. He did not shake his head or otherwise display confusion about the rights that had just been read to him (and that he, too, had read aloud). See Gov't Ex. 1 at approximately 1:17:13 p.m.

### III.  LEGAL ANALYSIS

### A.  *Did Orellana Provide a Voluntary, Knowing and Intelligent Waiver of His Miranda Rights?*

Orellana argues his statements should be suppressed because he did not voluntarily, knowingly and intelligently waive his *Miranda* rights.  Under *Miranda*, a suspect in custody must be advised as follows:

> He must be warned prior to any questioning that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda v. Arizona*, 384 U.S. 436, 479 (1966).  A suspect may waive these rights if the waiver is made voluntarily, knowingly and intelligently.  *Id.* at 444.  "[A] waiver is 'voluntary' where the court can determine that the waiver was a product of the suspect's free and deliberate choice, and not the product of intimidation, coercion, or deception." *Thai v. Mapes*, 412 F.3d 970, 977 (8th Cir. 2005).  "A waiver is 'knowing and intelligent' where it is made with full awareness of both the nature of the right being abandoned and the consequences of abandoning the right."  *Id.*  A waiver of *Miranda* rights may be either express or implied.  *See Berghuis v. Thompkins*, 130 S. Ct. 2250, 2261-62 (2010) ("Where the prosecution shows that a *Miranda* warning was given and that it was understood by the accused, an accused's uncoerced statement establishes an implied waiver of the right to remain silent.").  The government "need prove waiver only by a preponderance of the evidence."  *Colorado v. Connelly*, 479 U.S. 157, 168 (1986).

Orellana argues his waiver was not voluntary, knowing and intelligent.  He originally based this argument on the initial report, which indicated that he responded "Yes, I don't know what it means, but yes," when asked if he understood his rights.

6

Now that it is clear (from the Transcript and the Recording) that this was *not* Orellana's actual response, he has modified his arguments accordingly. He now argues that his response to the questions posed by Kolker, after she read his *Miranda* rights, was ambiguous because Kolker asked a compound question. He further argues that even if his response can be interpreted as a waiver, the waiver was ineffective because (a) the atmosphere was coercive, (b) the agents failed to follow up on his comment about his lack of education and (c) the agents failed to determine whether he was under the influence of methamphetamine or any other substance.

These arguments are unavailing. First, as noted above, the Recording demonstrates that Orellana nodded when Kolker asked if he understood his rights. While the Transcript could be read to suggest that Kolker asked two questions before allowing Orellana to respond, the Recording shows that she (a) asked the first question ("Do you understand?"), (b) paused while Orellana nodded, (c) said "OK" and then (d) asked the second question ("Are you willing to answer some questions?"). Orellana thus gave two separate affirmative responses to two separate questions. While his response to "Do you understand?" was nonverbal, it was sufficient to serve as an affirmative answer. *See, e.g., United States v. Yockey*, 654 F. Supp. 945, 954 (N.D. Iowa 2009) (holding that an officer was entitled to interpret a nonverbal "head nod" as an affirmative answer). Orellana indicated both (a) that he understood his rights and (b) that he was willing to answer questions. He then proceeded to answer questions. I reject Orellana's argument that he did not communicate an express waiver of his *Miranda* rights.

I further find the Government has met its burden of proving that the waiver was given knowingly, voluntarily and intelligently. As for knowingly and intelligently, the Transcript and the Recording show that Orellana read the rights aloud in Spanish, had them read aloud again by Kolker in Spanish and then responded affirmatively when asked

7

if he understood the rights. Orellana was thus told, and indicated he understood, that he did not have to answer questions, that anything he said could be used against him in court, that he had the right to consult with an attorney and have the attorney present during questioning, and that the attorney would be provided for him if he could not afford one. Gov't Ex. 2 at 5-6.

The fact that Orellana had previously indicated a lack of formal education does not require a finding that his waiver was made unknowingly or unintelligently. The Eighth Circuit Court of Appeals has held that even a suspect with a low-average to borderline I.Q. has the capacity to understand his or her rights. *United States v. Turner*, 157 F.3d 552, 555 (8th Cir. 1998). And, obviously, a lack of formal education does not equate to a lack of intelligence. There is no evidence that Orellana suffers from low intelligence or any other mental impairment that might have limited his ability to understand his rights. A review of the Transcript and the Recording provides no hint of such an impairment, as Orellana appears to have engaged in normal conversation without repeated expressions of confusion or an inability to comprehend the questions being asked.

The same is true regarding Orellana's argument that the agents failed to determine if he was impaired by drugs. Schmitt testified that based on his training and experience, he saw no indication of such impairment. Nor does the Recording reveal behavior by Orellana suggesting that he was impaired at all, let alone to such a degree as to prevent a knowing and intelligent waiver.

As to whether the waiver and the resulting, incriminating statements were given voluntarily, Orellana complains that he was under arrest, handcuffed and confined in an interrogation room with two armed officers at the time the waiver occurred. Those circumstances do not render his waiver involuntary. The test for determining voluntariness of a waiver or confession is whether it "was extracted by threats, violence, or direct or implied promises, such that the defendant's 'will [was] overborne and his

capacity for self-determination critically impaired." *United States v. Astello*, 241 F.3d 965, 967 (8th Cir. 2001) (quoting *United States v. Kilgore*, 58 F.3d 350, 353 (8th Cir. 1995)). Of course, any interrogation of a suspect involves some inherent pressure. *Id.* Even tactics such as deception, raised voices or promises of leniency do not render a waiver or confession involuntary unless they become so coercive as to cause the suspect's will to be overborne. *Id.* at 967-68.

The evidence here reflects nothing even close to that level of coerciveness. While Orellana was handcuffed at the time he waived his *Miranda* rights, the handcuffs were removed soon after and he continued to answer questions. He was provided with water during the interview and was treated respectfully throughout. While the officers advised him that the only way he could help himself was to talk, and tell the truth, no specific promises were made. The entire interview, including the discussion that led to Orellana's waiver of *Miranda* rights, was nothing other than a normal, routine interview of a suspect by law enforcement.

The Government has met its burden of proving by a preponderance of the evidence that Orellana voluntarily, knowingly and intelligently waived his *Miranda* rights prior to making the incriminating statements at issue. Orellana is not entitled to the suppression of those statements.

## IV. CONCLUSION AND RECOMMENDATION

For the foregoing reasons, I find that Orellana's statements should not be suppressed and RESPECTFULLY RECOMMEND that his motion to suppress (Doc. No. 20) be **denied**.

**IMPORTANT NOTE:** Because this case is scheduled for trial beginning September 2, 2014, objections to this Report and Recommendation must be filed by **August 8, 2014.** Responses to objections must be filed by **August 15, 2014.** Any

party planning to lodge an objection to this Report and Recommendation must order a transcript of the hearing promptly, but not later than **August 5, 2014*, regardless of whether the party believes a transcript is necessary to argue the objection*. If an attorney files an objection without having ordered the transcript as required by this order, the court may impose sanctions on the attorney.

**IT IS SO ORDERED.**

**DATED** this 31st day of July, 2014.

_____
LEONARD T. STRAND
UNITED STATES MAGISTRATE JUDGE